## In re HERMANS.
### Patent Appeal No. 2677.

Court of Customs and Patent Appeals.
April 15, 1931.

Chas. H. Andros, of Albany, N. Y., for appellant.

T. A. Hostetler, of Washington, D. C. (Howard S. Miller, of Washington, D. C., of counsel), for Commissioner of Patents.

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges.

LENROOT, Associate Judge.

This is an appeal from a decision of the Board of Appeals of the United States Patent Office affirming the decision of the Examiner, rejecting claims 1 to 10, inclusive, and 12, 13, 14, 20, and 21 of appellant's ap-

plication, for lack of invention over the prior art.

Claims 1, 3, 8, and 20 are illustrative of the claims in issue, and read as follows:

"1. In a device of the class described, in combination, a casing adapted to contain an explosive, releasable means adapted to cause an explosion thereof, releasing means separate from said exploding means adapted to release the same and permit said means to cause said explosion, said releasing means being actuated by water pressure, and means for controlling the action of said water pressure dependent upon the depth and time of immersion."

"3. In a device of the class described, in combination, a shell adapted to contain an explosive and a detonator therefor, releasable means for firing said detonator, actuating mechanism for releasing said firing means including means normally retaining said firing means under tension adapted to be actuated by the flow of water dependent upon the time and depth of immersion, and a valve for controlling the water for actuating said means, said valve being adjustable by the operator to vary the time of explosion dependent upon the depth of immersion."

"8. In a device for use as a mine and adapted to function upon mere immersion in water, a casing, an explosive and a detonator therefor, means for exploding the detonator, and means carried by the device for releasing the exploding means; the operation of said releasing means being controllable depending upon the depth or time of immersion."

"20. The method of combating submarine vessels which comprises launching from a surface vessel an explosive charge without substantial initial velocity, and thereafter exploding the same under water by hydrostatic pressure."

The references are: Graydon, 356067, January 11, 1887; Lynch et al., 678367, July 16, 1901; Lynch et al., 682728, September 17, 1901; Unge, 806026, November 26, 1905; Niehoff, 820888, May 15, 1906; Hallock, 1183375, May 16, 1916; Scoville, 1203058, October 31, 1916; Des Rosiers, 1207511, December 5, 1916.

Appellant's alleged invention is a depth bomb and method of combating submarines. It comprises a container which is divided into two chambers, one of which carries the explosive and the other of which is normally empty, but adapted to fill with water, and the movement of this element releases a pre-energized firing pin to detonate the explosive. The depth or time at which the detonation occurs is controlled by means of a valve regulating the rate of inflow of water.

All of the questions involved in this appeal are questions of fact, and, as the tribunals of the Patent Office concurred in their determinations, they will be accepted by us, unless manifestly wrong. In re Demarest, 38 F.(2d) 895, 17 C. C. P. A. 904.

Claims 8, 20, and 21 were held by the Board of Appeals to be anticipated by any one of several named references. All of the other claims were rejected upon a combination of references, some of which were held to be applicable without modification, while others, it was held, would require modification involving only mechanical skill. It was also held that there was no invention in combining the several elements shown by the references, as appellant has done.

Appellant earnestly insists that what he did was not obvious in view of the references, but did, in fact, involve invention. In support of this contention he relied very largely upon a publication by the Navy Department, entitled "Navy Ordnance Activities, World War, 1917–1918," published in 1920, and he placed before the Patent Office tribunals extracts from such publication which are found in the record. Said extracts describe a depth bomb devised in 1917 by the Bureau of Ordnance, in which a float became detached from the charge proper upon striking the water, and remained on the surface while the charge sank, and, in sinking, paid out rope attached to the buoy, which rope eventually fired the charge.

In his brief in this court, referring to said publication, appellant states:

"This publication is an authoritative and interesting commentary upon the general state of the art at the time of applicant's invention. It describes in considerable detail the problem with which the allied nations were confronted, the solutions which were attempted and discarded before applicant's solution was finally adopted, and it refutes any possible contention on the part of the Office that applicant's solution could possibly have been the 'obvious thing' to do. * * * *"

We have examined the publication thus referred to, and, immediately following the extracts quoted therefrom in the record, we find a statement that at the entrance of the United States into the war the Navy Department developed a new type of depth bomb

operated by hydrostatic pressure. We quote from said publication, pages 99 and 100, as follows:

"Meanwhile, however, the Naval Torpedo Station at Newport had developed a type of hydrostatically operated depth charge, which appeared at least the equal of even the latest British design. This firing mechanism was mainly the work of the Bureau's engineer of mines and explosives, Mr. C. T. Minkler. * .* *

"Manufacture in quantity of the American depth charge of the Newport design, now known as Mark II, was at once commenced, under the direction of Commander S. P. Fullinwider, and *the issue to the service began in the fall of 1917. The first contract for 10,000 of these Mark II depth charges was placed in July, 1917.* Later, modifications of the Mark II depth charge were made and contracts for 20,000 more were issued in the spring of 1918. In December, 1917, the bureau placed a contract for 15,000 British type depth charges for the British Government. * * * (Italics ours.)

"The American and British depth charges differ in several main particulars. Ours fires by means of hydrostatic pressure, while the British utilize the seepage principle also. * * *

"The depth charge consists of a cylindrical metal case, approximately 18 inches in diameter and 28 inches long for the 300-pound depth charge, containing the explosive and firing mechanism, or pistol, as it is called. By means of a dial at one end of the case, the depth charge may be set to explode at one of several depths from 50 to 200 feet. When the depth charge reaches the depth at which it is set to explode, the pistol is actuated by the hydrostatic pressure at that depth and explodes the charge."

It thus appears that, instead of discarding all other solutions "before applicant's solution was finally adopted," as claimed by appellant, the Navy Department had perfected in 1917 a successful depth bomb operated by hydrostatic pressure, while appellant did not file his application until January 24, 1918, and, according to a statement to his counsel before the Patent Office, offered his device to the Navy in the spring of 1918.

Therefore said publication is not helpful to appellant, and does not indicate that he made any contribution to the solution of the then very pressing problem before our government.

This, of course, does not negative invention upon the part of appellant in his particular device, and is not cited as an anticipation thereof, but it does negative appellant's contention, in so far as it is based on said publication, that his solution was not obvious because the Navy Department was unable to produce a successful depth bomb until appellant laid before the Navy officials his alleged invention; the fact being, according to said publication, that the broad idea of appellant's device was successfully put into operation in 1917.

We are not convinced that the Board of Appeals was manifestly wrong in its decision, and it is affirmed.

Affirmed.